UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

LYDIA CARABALLO,

        Plaintiff,

        v.                                                        Case No. 11-C-0368

MICHAEL J. ASTRUE,

        Defendant.

DECISION AND ORDER REVERSING AND REMANDING TO THE COMMISSIONER
FOR FURTHER PROCEEDINGS

Lydia Caraballo applied for disability insurance benefits ("DIB") and supplemental security income ("SSI"), alleging a disability onset date of June 1, 2004. (Tr. 113.) After the agency denied her applications, Caraballo requested a hearing and appeared before an administrative law judge, Wayne L. Ritter. (Tr. 22-36.) During the hearing on December 1, 2009, Caraballo amended her alleged onset date to March 19, 2006. (Tr. 25.) Subsequently, the ALJ determined that Caraballo was not "disabled" within the meaning of the Social Security Act and could perform a significant number of light jobs. (Tr. 13-19.) The Appeals Council declined review and the ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner"). 20 C.F.R. §§ 404.981, 416.1481. For the reasons set forth below, this court will reverse the Commissioner's denial of benefits to Caraballo and remand for further proceedings.

At the time of her hearing, Caraballo was 55 with a high school education and prior work as a certified nursing assistant in a nursing home and a hospital. (Tr. 35.) Caraballo testified that she has used a brace on her right knee for the past four years when she is going out and has to do increased walking. (Tr. 28, 29, 32.) In addition, she has used a

cane since she turned 50 and has had two surgeries on her right knee. When Caraballo is in her home, she can use the tables, chairs, and furniture to support her. (Tr. 32.) She can tolerate standing or walking up to 30 minutes, but after that the pain increases in the right leg which sometimes gives out. She cannot squat, and low pack pain limits prolonged sitting. (Tr. 33, 34.) The right knee is more symptomatic than the left. Caraballo also testified that she has migraines that have not resolved even though she continues to take Midrin. (Tr. 31.) She also stated that she takes no medications other than her high blood pressure medication. (Tr. 29, 32.)

Caraballo lives in an apartment with her husband and 15 year-old stepdaughter and that her husband does most of the driving. (Tr. 26, 36.) She cooks, but no longer does laundry and her stepdaughter and husband help with the cleaning. (Tr. 35.) During the day, Caraballo does light chores, reads, and watches television. (Tr. 27.) Caraballo's husband is the pastor of a small church (twenty-five members), and Caraballo deals with the church members. (Tr. 28.) Although she offered her husband as a witness to corroborate her daily activities, the ALJ responded "I believe what she said." Caraballo's attorney made the decision not to call her husband as a witness because there was not a credibility issue and his testimony would be redundant. (Tr. 48.)

Ronald Raketi testified as a vocational expert (VE). According to the VE, Caraballo's past work as a certified nursing assistant constituted medium work with a specific vocational preparation (SVP) of four. (Tr. 39.) The ALJ posed to the VE a hypothetical regarding a person of Caraballo's age, education, and work experience who could perform work with no exertional limitations, limited to no more than occasional climbing of ramps or stairs with no climbing of ladders, ropes, or scaffolds, and frequent balancing, and only occasional stooping and crouching. (Tr. 40.) That individual could not perform Caraballo's

past relevant work, but could be employed as a bindery worker, hand packager, and order filler. (Tr. 41-42.) If that same person were limited to light work, Raketi testified that there would be jobs available as a motel/hotel clerk, assembler, counter clerk, parking lot attendant, and machine tender. (Tr. 42-43.) However, if due to a combination of medium conditions and associated pain the person could not engage in sustained work activity on a regular and continuing basis for eight hours a day, five days a week, competitive work would be precluded. (Tr. 44.) Raketi further conceded that there would be no jobs if the person was limited to no stooping or squatting. (Tr. 44.) According to Raketi, his testimony was consistent with the Dictionary of Occupational Titles. (Tr. 45.)

The medical evidence in the record confirmed that Caraballo underwent operative arthroscopy of the right knee with partial medial meniscectomy on March 30, 2000. (Tr. 371.) While working in 2002, Caraballo suffered a right knee injury while lifting a patient. (Tr. 227.)

On January 28, 2003, an MRI of the right knee appeared abnormal. According the report, "there is significant denuding of the cartilage in the medial compartment with almost complete loss of cartilage over the weight bearing surfaces in the medial tibiofemoral compartment and focal areas of bone marrow edema in the subchondral femur and tibia. There are small osteophytes. Findings are consistent with progressive mild to moderate osteoarthritis." (Tr. 255.)

On July 30, 2004, Caraballo had a psychological evaluation with a GAF of 50. (Tr. 219.) Two months later, her primary care physician, Dr. Moore, prepared a letter update regarding Caraballo's consultation with Dr. Thomas O'Keefe of Ann Arbor Orthopedic Surgery Group. It was Dr. O'Keefe's determination that the x-rays demonstrated bilateral endstage osteoarthritis resulting in a complete obliteration of the medial joint spaces when

3

standing and that Caraballo would be a candidate for knee arthroplasty in the near future. (Tr. 200.) She was advised to stay off work.

Dr. O'Keefe met with Caraballo on December 28, 2004, and discussed that she was at the endstage of osteoarthritis of the knee bilaterally. He explained to her that she was not a candidate for an osteotomy and that the only definitive treatment available to her would be knee artrhoplasty. Dr. O'Keefe noted that she was young to be considering such procedure and explained the inherent risks. The doctor also discussed bracing, anti inflammatory medications and injections. (Tr. 373.)

The consultative examiner, Dr. S.L. Schucter, evaluated Caraballo on March 16, 2006. Dr. Schucter observed periarticular thickening about both knees with the right knee being warm. (Tr. 221.) In his completed questionnaire, Dr. Schucter noted that Caraballo is unable to stoop, squat and arise from squatting, or perform rapid alternative movements. (Tr. 222.) Her gait appeared abnormal both with and without the cane and the clinical evidence supported the need for a walking aid to reduce pain. (Tr. 223.)

On June 22, 2006, Dr. Rosenbaum, a clinical psychologist, conducted a consultative examination and assigned a GAF of 60. Caraballo had an Axis I diagnosis of pain and mood disorder. (Tr. 239.) Her prognosis was "fair to guarded." (*Id.*)

Dr. Moore noted Caraballo's complaints of bilateral knee pain requiring use of the cane on May 24, 2007. However, she did not have insurance coverage and it was difficult for her to get follow-up care. (Tr. 247.) Dr. Moore indicated that he hoped to get Caraballo in to the Washtenaw Health Plan and to refer her to orthopedics for a follow-up. (*Id.*)

An MRI of the right knee on July 21, 2007, appeared abnormal confined to the femorotibial compartment where there was a horizontal cleavage tear to the body and

4

posterior horn of the medial meniscus. (Tr. 253.) In addition, there were moderate osteoarthritic changes in the femorotibial compartment with hyaline cartilage narrowing and osteophyte formation. (Tr. 253.)

On September 22, 2007, another consultative examination was conducted by Dr. Andrew Friessen. (Tr. 270-272.) He relied on Caraballo's reports of her medical history, and his own examination. In general, Dr. Friessen felt that Caraballo's gait was normal and that she did not require an assistive device. (Tr. 271.) He noted Caraballo's history of bilateral knee pain as well as arthroscopy twice on the right and once on the left. However, he felt Caraballo had a full range of motion in her knees. (Tr. 272.)

Caraballo returned to Dr. Moore on October 4, 2007, with complaints of knee pain that was worsening, with the right more severe than the left. (Tr. 300.) She was experiencing tenderness in both knees with flexion and extension. Her right knee appeared swollen. (*Id.*)

Caraballo was experiencing a burning sensation in both knees, with the right greater than the left when she was seen by Dr. Moore on February 13, 2008. Because of these worsening complaints, Dr. Moore prescribed Vicodin for knee pain and referred Caraballo back to orthopedics. (Tr. 278.) (*Id.*) She had tenderness with palpation of the medial right knee. (*Id.*)

The consultative examiner, Dr. Thomas Horner, diagnosed Caraballo with dysthymia with major depressive symptoms and knee pain with a GAF of 50 on April 10, 2008. (Tr. 302-308.) In addition, Dr. Moore recorded her complaints of persistent pain and recommended continued use of anti-inflammatories, ice, and elevation. (Tr. 327.)

5

The last records in the file are from Dr. Bahatia, a primary care physician, who saw Caraballo for poorly controlled hypertension, follow-up on lab results, high cholesterol, and complaints regarding left and right knee pain. (Tr. 358.) Two subsequent visits to Dr. Bahatia focused on hypertension, high cholesterol and carpal tunnel syndrome rather than knee pain. (Tr. 355, 349.)

The ALJ found that the Caraballo has a bilateral knee joint disease, but no impairment or combination of impairments that meet or are medically equal to one of the listed impairments. He relied on the VE's testimony that an individual with Caraballo's age, education, work experience, and residual functional capacity would be able to perform the requirements of hotel/motel clerks, assemblers, counter clerks, parking lot attendants, and machine tenders. (Tr. 18.) Therefore the ALJ found Caraballo "not disabled."

The Social Security Act, 42 U.S.C. § 405(g), requires the Commissioner's findings to be sustained if supported by substantial evidence. Hence, this court will reverse the Commissioner's findings only if they are not supported by substantial evidence or if the Commissioner applied an erroneous legal standard. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971). In making this determination, the court reviews the entire administrative record, but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner. *See Powers v. Apfel*, 207 F.3d 431, 434-35 (7th Cir. 2000). At the same time, the court will not simply rubber-stamp the Commissioner's decision without a critical review of the evidence.

As an initial matter, Caraballo attacks the ALJ's RFC determination limiting her to light work with no more than frequent balancing, occasional climbing of ramps/stairs, and no more than occasional stooping, crouching, kneeling, and crawling. However, in reaching this determination there are numerous errors and misstatements regarding the medical history.

Most striking is the ALJ's reliance on the consultative exam performed by Dr. Schucter on March 16, 2006, and a later opinion by the "same evaluator." Specifically, the ALJ summarized his findings as follows:

> There was an opinion at an early physical examination that the claimant was unable to stoop and perform other acts that would result in a finding of disability if such assessment was strictly followed. However, the same evaluator subsequently found the claimant had a full range of motion in both knees and did not require the use of a cane to walk. The undersigned notes the claimant's representative focused on the claimant's knees and argued the claimant could do no more than sedentary work. However, the undersigned notes the objective findings are mild to moderate at most, with an examination from 2007 showing full range of motion with no swelling or tenderness, and 5/5 strength in upper and lower extremities. Again, the claimant had not pursued more aggressive care and was not taking prescribed medication for pain.

(Tr. 17.)

The government concedes that the "ALJ erred when he stated that the same evaluator, i.e., Dr. Schucter, rendered the finding that Ms. Caraballo had normal ranges of motion in her knees and did not need a cane." There is no subsequent evaluation by Dr. Schucter. When Dr. Schucter examined Caraballo, he found that her flexion in her left knee was 0 to 110 degrees and 0 to 100 degrees in the right knee. Normal is 0 to 150 degrees. He noted "periarticular thickening" with respect to both knees and completed a supplemental report indicating that based on his objective examination Caraballo could not

7

stoop, squat, and arise from squatting, and rapidly alternate movement. His report indicates that Caraballo's reflexes in the lower extremities were hypoactive and that her gait was abnormal with and without the cane. Based on the clinical evidence, Dr. Schuchter felt that Caraballo needed the cane to reduce pain. (Tr. 223.)

The government argues that the error is "easily explained" inasmuch as a different evaluator, Dr. Andrew Friessen, examined Caraballo on September 22, 2007, at the request of Michigan's Family Independence Agency and concluded her gait was normal and that she did not require an assistive device. (Tr. 271-272.) Regardless of whether the government can explain away this error, the ALJ never addressed any inconsistencies between Dr. Schucter and Dr. Friessen's reports. Moreover, the ALJ's summary is riddled with other inaccuracies suggesting that the decision was not based on substantial evidence.

For example, the ALJ states repeatedly that Caraballo's care has been "rather sporadic over the years," "that she has not pursued more aggressive care," and that she "was not taking prescribed medication for pain." (Tr. 17.) However, the record discloses that on May 24, 2007, Caraballo did not have medical insurance that would allow her to follow up with orthopedic care on her knees. Consequently, on remand, the ALJ is directed to consider SSR 96-7p, which instructs that the "adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."

In addition, at page 5 of the decision, the ALJ states that Caraballo has not been recommended for additional knee surgeries and that x-rays and MRI testing showed only

8

"mild" degenerative joint disease in her knees. (Tr. 17.) This summary ignores that Dr. O'Keefe's recommendation that knee replacement was the only option and that two MRIs showed more than "mild degenerative joint disease." The June 28, 2003, MRI found significant denuding of the cartilage in the medial compartment with almost complete loss of cartilage over the weight bearing surfaces and the medial compartment and the focal areas of bone marrow edema in the subchondral femur and tibia. (Tr. 255.) The osteoarthritis in the right knee was described as progressive when compared to the April 9, 2002, MRI. (Tr. 235.) In addition, the July 21, 2007, MRI revealed a likely tear of the medial meniscus associated with "moderate osteoarthritic changes in the femorotibial compartment with hyaline cartilage narrowing and osteophyte formation." (Tr. 257.)

On remand, the ALJ should similarly revisit the issue of credibility. The decision includes meaningless boilerplate language widely criticized in this circuit:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting affects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. 17.) *See McClesky v. Astrue*, 606 F.3d 351, 352 (7th Cir.2010)

Moreover, the ALJ cited the function report completed on March 2, 2008, selectively stating that she "was getting her daughter to and from school, managing personal hygiene, some cooking and laundry, reading, grocery shopping, attending church, talking on the telephone and watching movies. The same report indicates that Caraballo tires easily, experiences shooting pain in her knees, and is limited to what she can do for 10-15 minutes at a time. Moreover, during the hearing, Caraballo testified about her daily

9

activities and her ability to stand or sit. Also, the ALJ indicated that he believed what Caraballo said, thereby causing her attorney to not call her husband to corroborate her testimony.

The government responds that Caraballo's activities were not the only factor underlying the ALJ's decision and that the ALJ pointed out that Caraballo "did not take prescription medications for these other conditions (including her knee pain)." However, the record discloses that she took prescription medications, including Vicodin, for pain and there was at least a period of time that she lacked insurance coverage.

Although the ALJ may rely on the claimant's noncompliance, he made no inquiry regarding Caraballo's noncompliance, despite its clear relevance to the issue of credibility. Indeed, the ALJ asked if she is taking medication for depression or "anything like that" and asked when she stopped. He did not ask about pain medication, why she stopped, or inquire about health insurance coverage, notwithstanding the reference to a lack of coverage in the record. Therefore,

IT IS ORDERED that the Commissioner's denial of benefits is reversed.

IT IS FURTHER ORDERED that this case is remanded for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence four).

Dated at Milwaukee, Wisconsin, this 20th day of August, 2012.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE